**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Fred Stevens
Stephanie R. Sweeney
Christopher J. Reilly

*Special Litigation Counsel to Plaintiff Gregory Messer,*
*    Chapter 7 Trustee of the Estate of Fyre Festival LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
| | |
|---|---|
| In re | : |
| | :       Chapter 7 |
| FYRE FESTIVAL LLC, | : |
| | :       Case No. 17-11883 (MG) |
| Debtor. | : |

---------------------------------------------------------------x
| | |
|---|---|
| GREGORY M. MESSER, as Chapter 7 Trustee of the | : |
| Estate of Fyre Festival LLC, | : |
| | : |
| Plaintiff, | : |
| | :       Adv. Pro. No. 19-_____ |
| -against- | : |
| | : |
| YARON LAVI, | : |
| | : |
| Defendant. | : |

---------------------------------------------------------------x

**COMPLAINT SEEKING THE AVOIDANCE AND**
**RECOVERY OF FRAUDULENT AND PREFERENTIAL TRANSFERS**

        Gregory M. Messer, the Chapter 7 Trustee (the "Trustee" or "Plaintiff") of the estate of

Fyre Festival LLC ("Fyre Festival" or the "Debtor"), by and through his counsel, Klestadt Winters

Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against Yaron

Lavi (the "Defendant"), upon information and belief, alleges as follows:

## PRELIMINARY STATEMENT

William Z. McFarland, a/k/a Billy McFarland ("McFarland") and his business partner, hip hop artist Jeffrey Atkins, a/k/a Ja Rule ("Ja Rule"), started Fyre Media Inc. ("Fyre Media") in early 2016 with the intention of creating and promoting a software application for booking entertainment.  In or around late-summer 2016, the two conceived of the "Fyre Festival" (the "Festival"), which was to be a unique destination concert experience in the Caribbean aimed at young millennials and featuring a number of top musical acts.  The Festival was scheduled over two weekends in April and May 2017 in the Exumas, Bahamas, and was intended to, among other things, promote Fyre Media's booking application.  The Festival was self-described in an offering memorandum designed to solicit investments as follows:

### OVERVIEW

Fyre Festival leverages our global access to talent and
our understanding of the millennial demographic to create

### THE CULTURAL EXPERIENCE OF THE DECADE.

**Fyre Festival** is a rich experience that emboldens
our quest to connect to a diverse set of influencers.

For two weekends in April and May, the curious and adventurous come
together on a private **Exuma island**:

Fyre Festival will feature **music** from the greatest talents in the world,
**immersive experiences** through art, theater, and a weekend long **treasure
hunt**; as well as **informative discussions** with some of the brightest minds
in the world.  Fyre will be defined by its ability to connect: the ultimate in
a tasteful experience.

(emphasis in original).

The Festival was promoted on Instagram, Twitter and other social media outlets by numerous "influencers" including socialite and model Kendall Jenner, as well as a number of famous models like Bella Hadid and Emily Ratajkowski.  Ticket buyers were promised an exotic island adventure with luxury accommodations, gourmet food, the hottest musical acts and celebrity attendees.  The unique social media marketing method employed by Fyre Festival tapped in on the

power of FOMO (short for "fear of missing out") and was extraordinarily successful amongst millennials, resulting in significant ticket sales.

When concertgoers arrived at the Festival on April 27, 2017, they "were met with total disorganization and chaos."[1]  None of the promised musical acts showed up or performed.  The luxury accommodations turned out to be FEMA disaster relief tents.  The gourmet food consisted of the now infamous cheese sandwich served in a Styrofoam container that was even joked about by Tina Fey during her opening monologue at the 2019 Academy Awards.[2]  Feral dogs roamed the site and no models or celebrities, including those that promoted the Festival and told their social media followers that they would be there, were in attendance.  The disaster that became of the Festival is now infamous, capturing the attention of popular culture and spawning two separate documentaries on Hulu and Netflix.

McFarland raised and spent over $16 million in connection with the failed Festival, at least that the Trustee has identified thus far.[3]  Nearly all of those funds were deposited into and disbursed from accounts held by Fyre Media, Fyre Festival's parent company (Fyre Media and Fyre Festival collectively, the "Fyre Entities"), or transferred by Fyre Media to McFarland and then disbursed by McFarland.  Most of the funds were borrowed from individuals and institutions that were defrauded by McFarland.  Among many other things, McFarland promised investors significant

---

[1]  This description was given by the Bahamas Ministry of Tourism on April 28, 2017.  The full statement is available at https://www.bahamas.com/article/bahamas-ministry-tourism-statement-fyre-festival.
[2]  Ms. Fey said to the crowd, "hey everybody, look under your seats, you are all getting one of those cheese sandwiches from the Fyre Festival."
[3]  Accounts of the amounts of money raised and spent vary.  The United States Securities and Exchange Commission (the "SEC") and the United States Attorney claim that over $16.5 million was raised from defrauded investors in Fyre Festival, plus an additional approximately $8 million raised from defrauded investors for Fyre Media.  The Trustee's investigation has identified approximately $12.5 million raised from defrauded investors and creditors of Fyre Festival, approximately $1.4 million raised from ticket sales, approximately $1.5 million raised from a company for advances on prospective future ticket sales, and approximately $1 million raised from sales on prepaid wrist bands from Festival attendees.  Funds raised for the Festival would most often be deposited into Fyre Media accounts, then transferred directly to recipients or transferred to McFarland's personal accounts before finally reaching the ultimate recipient.

returns and told them that Fyre Festival owned land in Exuma worth $8.4 million and had over $14 million in receivables, none of which was true. McFarland is now serving a six-year sentence in federal prison and owes over $26 million in restitution on account of his frauds.

McFarland used much of the funds raised from defrauded investors and ticketholders to fund legitimate expenses of the doomed Festival. However, significant amounts were recklessly spent in continuation of McFarland's schemes. Just by way of example, significant amounts were spent on musical acts that never showed up (including $500,000 to Blink 182), over $2.25 million to influencers that promoted the Festival on social media without indicating to their followers and the public that they were paid for promoting the Festival (including $275,000 to Kendall Jenner for a single social media post), over $500,000 to the company that shot and edited Fyre Festival ads and Festival footage which ultimately used that footage to produce a profitable and popular documentary panning the Festival (without sharing any of the proceeds of that documentary with those victimized by McFarland), and over $1.8 million for prepaid private flights to and from the Festival that never happened.

By the instant Complaint, the Trustee seeks the avoidance and recovery of $331,709.83 paid to the Defendant (the "Transfers") in connection with the Defendant's agreement to serve as director of the Festival, which turned out to be a disaster of epic proportions. The Trustee asserts that the Transfers are avoidable as (i) actual fraudulent transfers as they were in continuation of McFarland's fraud, and/or (ii) constructive fraudulent transfers because Fyre Festival did not receive reasonably equivalent value in exchange for the Transfers and they were made while Fyre Festival was insolvent, and/or (iii) preferential transfers because they were in payment of obligations within ninety days of Fyre Festival's bankruptcy filing. Accordingly, the Trustee seeks

to avoid the Transfers for the benefit of Fyre Festival's defrauded investors, lenders and Festival attendees.

## **INTRODUCTION**

1.      On July 7, 2017 (the "Petition Date"), an involuntary petition under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") was filed against Fyre Festival by alleged creditors John Nemeth, Raul Jimenez and Andrew Newman.

2.      On August 29, 2017, the Court entered the Order for Relief in Fyre Festival's case [Docket No. 4].

3.      The Order for Relief directed Fyre Festival to file all schedules, statements, lists and a creditors' matrix within fourteen (14) days of its entry, or September 12, 2017, and on December 13, 2017, the Court entered an order designating McFarland as the person responsible for performing Fyre Festival's duties under the Bankruptcy Code [Docket No. 26], which gave McFarland a further extension until December 27, 2017 to file the required documents with the Court.  To date, McFarland has not filed the required bankruptcy schedules or statement of financial affairs, testified at a meeting of creditors, or performed any other duties as required by the Bankruptcy Code and the Court's Orders.

4.      On or around August 31, 2017, Gregory M. Messer was appointed interim trustee of Fyre Festival's estate.  On or about November 17, 2017, the Trustee presided over the first meeting of creditors pursuant to section 341(a) of the Bankruptcy Code and duly qualified and became the permanent trustee herein by operation of section 702(d) of the Bankruptcy Code.

## BASIS FOR RELIEF

5.     This adversary proceeding is brought pursuant to 11 U.S.C. §§ 544, 547, 548 and 550, Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and §§ 273, 274, 275 and 276 of the New York Debtor and Creditor Law.

## JURISDICTION

6.     This adversary proceeding relates to the bankruptcy case of *In re Fyre Festival LLC, Debtor*, Case No. 17-11883 (Bankr. S.D.N.Y. Jul. 7, 2017) (the "<u>Bankruptcy Case</u>") which is pending under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York before the Honorable Martin Glenn, United States Bankruptcy Judge (the "<u>Bankruptcy Court</u>").

7.     The Bankruptcy Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b), and 1334(b), and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York (Preska, C.J.), dated January 31, 2012.  This Court has jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

8.     Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

10.     Gregory M. Messer is a member of the panel of private Chapter 7 trustees established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1).  The Trustee is the permanent Chapter 7 trustee of Fyre Festival and its bankruptcy estate and is empowered to bring

this action.  The Trustee maintains an address for the conduct of business at 26 Court Street, Brooklyn, New York 11242.

11.     Fyre Festival is a limited liability company formed on or around December 14, 2016 and existing under the laws of the State of Delaware.  Fyre Festival's registered office within the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801.  During its operation and prior to becoming a debtor under the Bankruptcy Code, Fyre Festival maintained offices at 52 Lispenard Street, TH1, New York, New York 10013.  Fyre Festival is the wholly-owned subsidiary of Fyre Media.

12.     Fyre Media is a corporation formed on or around March 3, 2016 and existing under the laws of the State of Delaware.  Fyre Media maintains an address for the service of process of c/o CT Corporation Systems, 28 Liberty St., New York, New York 10005, and c/o CT Corporation Systems, 111 8th Avenue, 13th Floor, New York, New York 10011.  During its operation, Fyre Media maintained offices at 52 Lispenard Street, TH1, New York, New York 10013.

13.     McFarland is an individual with a current address at Inmate No. 91186-054, FCI Otisville, Federal Correctional Institution, P.O. Box 1000, Otisville, New York 10963.

14.     Lavi is an individual with a residence in the State of New Jersey.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.  Fyre Festival – Origin to Disaster

15.     In or around 2013, McFarland, then 22 years old, founded Magnises Inc., a company that marketed an invitation-only charge card.  The Magnises card was marketed as the "black card" for millennials and was supposed to entitle card holders to exclusive tickets, events and experiences.

16.    In or around March 2016, McFarland and Ja Rule founded Fyre Media, a digital media company, to develop, launch and manage a software application to be, in its words, "the first global marketplace for seamless and secure live entertainment booking."

17.    The concept for Fyre Media's business and platform was created by some combination of McFarland and Ja Rule.  McFarland served as Fyre Media's Chief Executive Officer.

18.    In mid- to late-2016, McFarland and Ja Rule conceived of and began promoting the Festival as a unique concert experience that would take place in Exuma over the course of two weekends in April and May of 2017.

19.    Tickets to the Festival were billed as "exclusive" and purported to cost between $1,200 and $100,000 per ticket or ticket package.  In promotional materials, the Festival was called "the cultural experience of the decade" which included travel via private jet from Miami to the Bahamas, VIP accommodations and A-list musical performances.

20.    Fyre Festival promised attendees that the Festival would feature top musical talent including Blink-182, Pusha T, Tyga, Major Lazer, Disclosure, Migos, and Kaytranada, among many others.

21.    The Festival was promoted through celebrities and influencers on social media including Bella Hadid, Emily Ratajkowski, Kendall Jenner, Elsa Hosk, Lais Ribeiro, Hailey Baldwin (n/k/a Hailey Bieber), Rose Bertram, Gizele Oliveira, Chanel Iman, and Shanina Shaik.

22.    Many of the models that promoted the Festival were featured in a promotional video shot and released in or around December 2016[4], which promised "an immersive music festival"

---

[4]   The promotional video is available at https://www.youtube.com/watch?v=mz5kY3RsmKo.

that "exceeds all expectations" to take place "over two transformative weekends" in April and May 2017 "on a remote and private island in the Exumas" that was "once owned by Pablo Escobar."

23.    Many of the models and influencers posted a simple orange tile with a link to the promotional video to their Instagram accounts at the same time in order to disrupt users' news feeds and draw attention to the Festival, like this post from Bella Hadid:



24.    While many of the models that promoted the Festival also attended photo and video shoots, Kendall Jenner received $275,000 from Fyre Festival for simply making the following post to social media:



25.    Ms. Jenner has since removed the post from her social media accounts, but has retained the $275,000 that she received from the Festival.

26.    A majority if not all of the models and influencers that were paid to promote the Festival did not indicate to their fans and followers that they were paid to advertise and promote the Festival.  Nor did they inform their fans and followers that they ultimately decided not to attend the Festival because of problems with the Festival of which they and their agencies were uniquely aware.

27.    Through the advertisements and promotions, McFarland and other employees of the Fyre Entities intentionally led the public to believe that the Festival would be filled with famous models on an exotic private island with "first-class culinary experiences and a luxury atmosphere."

28.    When attendees began arriving on Great Exuma for the Festival on April 27, 2017, they were met with chaos.

29.    The luxury accommodations promised to Festival attendees were actually FEMA disaster relief tents with plastic-wrapped mattresses, which, regardless of quality, were grossly insufficient in number to house the number of attendees.  The gourmet food consisted of the now infamous cheese sandwich.  Ferrell dogs roamed the site.  Attendees' luggage was dumped out of trucks with no organization.  No Fyre Festival personnel had answers for the confused attendees.

30.    At 3:06 pm on April 27, 2017, the band Blink-182, which was supposed to be one of the headliners for the Festival, tweeted:

> Regrettably, and after much careful and difficult consideration, we want to let you know that we won't be performing at Fyre Fest in the Bahamas this weekend and next weekend.  We're not confident that we would have what we need to give you the quality of performances we always give our fans.

31.    Blink-182 had already been paid $500,000 when it cancelled at the last minute.  The band has retained those funds.  In its cancellation tweet, the band did not disclose to its fans and others any of the problems that it was having with Fyre Festival and its management, or that the Festival appeared to be in serious trouble.

10

32.     Finally, on the morning of April 28, 2017, Fyre Festival announced on Twitter, "after assessing the situation this morning and looking at best options for our guests, we cannot move forward as we hoped we could. . . ."

33.     Attendees had significant difficulty getting off the island once they were there, and many were locked in the airport for a night while they waited for return flights.

34.     The Bahamas Ministry of Tourism released this statement on April 28th, describing the chaotic event[5]:

> We are extremely disappointed in the way the events unfolded yesterday with the Fyre Festival.  We offer a heartfelt apology to all who traveled to our country for this event.  Tourism is our number one industry and it is our aim to deliver world-class experiences and events.  Hundreds of visitors to Exuma were met with total disorganization and chaos.  The organizers of Fyre recently asked the Ministry of Tourism for support for their private event. The Ministry of Tourism is not an official sponsor of Fyre Festival.  Given the magnitude of this undertaking, the MOT lent its support as we do with all international events.  We offered advice and assisted with communications with other government agencies.  The event organizers assured us that all measures were taken to ensure a safe and successful event but clearly they did not have the capacity to execute an event of this scale. A team of Ministry of Tourism representatives is on the island to assist with the organization of a safe return of all Fyre Festival visitors.  It is our hope that the Fyre Festival visitors would consider returning to the Islands Of The Bahamas in the future to truly experience all of our beauty.

35.     In the aftermath of the Festival, both Hulu and Netflix released documentaries about the Festival – Hulu's *Fyre Fraud*, released on January 14, 2019, and Netflix's *Fyre: The Greatest Party That Never Happened*, released on January 18, 2019.  Both documentaries chronical McFarland's frauds and the disaster that became of the Festival.

---

[5]   Statement available at: https://www.bahamas.com/article/bahamas-ministry-tourism-statement-fyre-festival.

**B. Fyre Festival Raised Funds by Defrauding Lenders, Investors and Ticketholders**

36.    McFarland raised money for the Festival by defrauding investors, lenders and ticket purchasers. Fyre Festival raised and expended not less than $16.5 million according to the SEC and United States Attorney.

37.    McFarland acted as the primary solicitor of investments in Fyre Festival via investment contracts, which gave investors the rights to profits in the Festival's commercial enterprises.

38.    In offering documents and other communications with Fyre Festival investors, McFarland:

a) Made false statements concerning Fyre Festival's assets;

b) Falsified financial data;

c) Made false claims of affiliations with talent;

d) Created a fraudulent brokerage statement in order to suggest to investors and banks that McFarland personally possessed collateral sufficient to securitize investments; and

e) Claimed that he would obtain event cancellation insurance for the Festival, which he never did.

39.    In January 2017, McFarland created a Private Placement Memorandum (the "PPM") concerning Fyre Media and Fyre Festival, which was widely distributed to existing and prospective investors in early 2017.

40.    The PPM included, on Fyre Festival's balance sheet as of January 1, 2017, assets including accounts receivable of $14,827,382.97 and "BlackPoint Exuma Land" valued at $8,400,000. These assets did not exist. Certain investors relied on the claimed existence of these assets in making their investment decision.

41.    In response to requests from certain existing and prospective Fyre Festival investors that their investments be collateralized, McFarland created a fake brokerage statement, which

12

showed that McFarland owned $2.56 million in shares in the common stock of Facebook, Inc. ("Facebook").  In fact, McFarland owned just $1,499 worth of Facebook shares, a tiny fraction of the shares indicated by the fake brokerage statement.

42.    McFarland attached the fake brokerage statement to certain executed investor agreements and made numerous misstatements concerning his fictitious shares of Facebook in emails and texts to other prospective investors.

43.    In early 2017, in an effort to keep the struggling Fyre Festival afloat, McFarland sought millions of dollars in personal loans from two banks. To attempt to induce the banks to grant him loans, McFarland provided false information in his loan applications, including representations inflating his net worth and reiterating the false claim that he owned $2.56 million worth of Facebook stock.

44.    McFarland also provided one of the banks with a copy of the fake brokerage statement, as well as a fraudulent Fyre Media income statement, which grossly inflated the company's revenue and income.

45.    Although both of McFarland's loan applications ultimately were denied, he told potential investors that the loans had been approved and that monies from these loans could serve as collateral for their investments.

46.    As an inducement to invest in Fyre Festival, McFarland also falsely communicated to actual and prospective investors that they would have the rights to payouts from Fyre Festival event cancellation policies if the festival did not proceed as planned. In reality, however, McFarland never obtained any event cancellation policies for the Festival.

47.    McFarland's false statements confirming the purported existence of these policies were material to the decision of at least one investor to invest in Fyre Festival.

48.     McFarland also falsely told investors that a number of stars—including Justin Bieber and Drake—would perform at the Fyre Festival, when, in fact, no such agreements were ever reached. McFarland persisted in these false representations regarding artists, despite requests to desist by the artists' agents.

49.     McFarland and Fyre Festival representatives made numerous misrepresentations to ticket purchasers in order to induce them to purchase tickets and attend the Festival.  Fyre Festival received in excess of $1.4 million from ticket sales, plus an additional $1.5 million from a ticket vendor for advance ticket sales.

50.     When Fyre Festival was desperate for money to fund the doomed Festival, it informed ticket purchasers by email that:

> Fyre Festival is a cashless festival designed to be experienced with your digitally-enabled Fyre Band, a wristband that acts as your festival ID and password-protected payment method. ATMs will not be available at either event site, so plan ahead if you think you'll want cash on hand in case of emergency.

51.     In the one week leading up to the Festival, Fyre Festival actively encouraged ticketholders to put significant amounts onto their prepaid wristbands (the "Fyre Bands"), recommending $300 per attendee per day, and sent emails to attendees who had already put significant funds on their Fyre Bands telling them that they should "top off" the amount on their Fyre Bands ahead of the Festival.   In just one week, Fyre Festival raised over $1 million in prepayments from ticketholders on their Fyre Bands.

**C.  McFarland's Criminal Conduct and Admission of Fraud**

52.     On October 2, 2017, McFarland was charged by the United States Attorney with wire fraud in connection with allegedly defrauding investors in the Festival and Fyre Media.  See United States v. William McFarland, Case no. 17-cr-00600 (NRB) (S.D.N.Y. Oct. 2, 2017) (the "McFarland Criminal Action").

14

53.     On March 6, 2018, McFarland pled guilty to, among other things, wire fraud.  In connection with his plea, McFarland testified as follows:

> In an attempt to promote the digital application [of Fyre Media], I conceived and launched the idea for a music festival, the Fyre Festival.  While my intention for the Fyre Festival was legitimate, I grossly underestimated the resources that it would take to execute an event of the magnitude that I had come up with.

> So in an attempt to raise the funds that I deemed necessary to execute the event, I lied to investors about various aspects of Fyre Media and my personal finances.  These lies included false documents and information that I am aware were transmitted across interstate lines.

> In addition, on or about April 2017, I engaged in a fraudulent scheme in connection with a ticket vendor.  Specifically I provided false information to the vendor about Fyre Media's financial condition before entering into a guarantee agreement that induced the vendor to pay $2 million for a block of advance tickets in order to help fund the Fyre Festival.

McFarland Criminal Action, Dkt. No. 35, transcript of Mar. 2, 2019 hearing, pp.12-13.

54.     Before being sentenced on the original charges in connection with the Fyre Entities, on June 12, 2018, McFarland was arrested and charged for a second time in connection with another alleged ticket-selling scheme.

55.     On July 26, 2018, McFarland pled guilty to, among other things, wire fraud and bank fraud while on pretrial release in connection with the new charges.

56.     As set forth in greater detail in the government's sentencing memorandum, "[w]ith Fyre Media in 2016 and Fyre Festival in 2017, McFarland's lies about the rapid growth and incredible financial success of the Fyre companies led roughly 80 investors to lose over $24 million." The Government's Sentencing Memorandum, Docket No. 63 in Case No. 17-cv-00600, p. 23 (S.D.N.Y. Oct. 3, 2018).

57.     In sentencing McFarland, the Honorable Naomi Reice Buchwald, United States District Judge, noted:

> While defendant has argued that he committed these crimes because he suffers from certain psychological conditions which explain his actions, I reject that evaluation. Rather, it is my conclusion, based on all the submissions which I've carefully considered, that the defendant is a serial fraudster, and that to date his fraud, like a circle, has no end.
>
> Beyond his statement in Court today, which I do not know exactly how to evaluate, the absence prior to today of any moral recognition of the wrongfulness of his conduct is at the heart of the need for specific deterrence. It is also clear that Mr. McFarland has actually been dishonest most of his life. He started out with small scams which have grown over time.

McFarland Criminal Action, Dkt. No. 69, p.55, LL.6-18 (Oct. 11, 2018).

58.    On October 16, 2018, the United States District Court for the Southern District of New York entered judgment against McFarland, which included a term of six (6) years in federal prison and forfeiture to the United States in the amount of $26,191,306.28, the amount that McFarland raised from defrauded lenders and investors in the Fyre Entities.

**D.  The Transfer of Fyre Festival Funds in, to and Through Fyre Media and McFarland's Accounts**

59.    Fyre Festival maintained only two financial accounts – escrow accounts for the benefit of a flight vendor at First Western Trust Bank (account nos. ending in 0793 and 2468) (the "Air Travel Accounts").  The Air Travel Accounts were established and used exclusively in connection with the booking of and payment for flights, a requirement of the Federal Aviation Administration.

60.    The Air Travel Accounts were funded with at least $1.8 million in Festival Funds (as defined below), including by three transfers – $1.22 million from McFarland that he received from Fyre Media, $313,000 from Fyre Media, and $240,000 directly from defrauded investor Carola Jain.

16

61.    All other funds raised and expended by Fyre Festival were deposited into and disbursed directly from accounts maintained by Fyre Media and McFarland.

62.    Not less than $14,415,346.60 of Fyre Festival's funds (together with any funds borrowed by, invested in, received for the account of, or otherwise belonging to Fyre Festival, the "Festival Funds") were transferred to, deposited into and disbursed from Fyre Media's bank accounts (collectively, the "Festival to Media Transfers").  The Festival to Media Transfers include $10,471,000 in transfers by investors in and lenders to Fyre Festival, $1,404,531.86 in revenues from ticket purchasers, $1,500,000 from a company that paid for advance ticket sales, and $1,039,814.77 from ticket purchasers for amounts put on their Fyre Bands.

63.    Fyre Media then made transfers of Festival Funds to McFarland (collectively, the "Festival to McFarland Transfers", and together with the Festival to Media Transfers, the "Insider Fraudulent Transfers").  The Festival to McFarland Transfers from January 1, 2017 to April 30, 2017 were not less than $10,993,267.51.

**E. Use of Fyre Festival Funds**

64.    Much of the Festival Funds were used to pay vendors and service providers which provided legitimate and necessary services to the Fyre Festival.

65.    However, much of the Festival Funds were used to pay musical acts that never showed up or performed at the Festival, models and influencers who promoted the Festival at significant cost without disclosing to the public that they were paid for promoting the Festival, a production company that ultimately used the footage to co-produce a profitable Netflix documentary, a $187,250 deposit to a catering company that never provided food to the Festival, and over $1.8 million for flights that never took place.  These parties received Festival Funds at

the unfair expense of Fyre Festival's defrauded investors, creditors and ticketholders.  These expenditures are collectively referred to herein as the "Festival Fraudulent Transfers").

66.    McFarland commingled in his personal account his assets and the assets of Fyre Festival, Fyre Media and possibly other entities under his control.  During the period where the Festival to McFarland Transfers were made, McFarland spent not less than $315,645.87 on personal expenses including a luxury penthouse apartment, interior design and home furnishings, hotel stays, dining and entertainment, transportation, clothing and other things.

67.    Other Festival Funds were simply used to make "preferential transfers" to certain of Fyre Festival's creditors, which should be recovered by the Trustee for the benefit of all of the creditors of Fyre Festival (collectively, the "Festival Preferential Transfers").

68.    The Trustee has commenced an action against Fyre Media and McFarland seeking the avoidance in the first instance of the Insider Fraudulent Transfers as well as the exclusive right to pursue the recovery of any Festival Fraudulent Transfers and Festival Preferential Transfers.

**F. The Instant Transfers**

69.    Upon information and belief, the Defendant was an event producer with whom the Fyre Entities entered into a contract or agreement, pursuant to which he was to act as the director of the Festival.

70.    In connection with his agreement with the Fyre Entities, the following transfers were made to or for the benefit of the Defendant:

| Date | Transferor | Amount |
|---|---|---|
| 3/29/17 | Fyre Media | $ 100,000.00 |
| 3/29/17 | Fyre Media | $ 20,000.00 |
| 3/31/17 | Fyre Media | $ 10,000.00 |
| 4/6/17 | Fyre Media | $100,000.00 |
| 4/12/17 | McFarland | $ 81,709.83 |
| 4/12/17 | McFarland | $20,000.00 |

(as defined above, the "Transfers").

71.     The Festival was an epic failure.

72.     The Defendant has retained the full amount and benefit of the Transfers.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Fraudulent Transfers – Actual Fraud – 11 U.S.C. §§ 544(b), 548(a)(1)(A) and 550;
And N.Y. Debtor and Creditor Law § 276)**

73.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 72 of this Complaint as if fully set forth at length herein.

74.     Each of the Transfers was made from Festival Funds.

75.     Each of the Transfers constituted a transfer of an interest of Fyre Festival within the meaning of section 101(54) of the Bankruptcy Code.

76.     Each of the Transfers was to or for the benefit of the Defendant as set forth above.

77.     Fyre Festival was at all times undercapitalized and incapable of putting on the Festival in the manner promised to ticketholders, or repaying the funds borrowed from lenders to the Fyre Festival, or returning investments made in the Fyre Festival.

78.     McFarland admitted to his fraudulent scheme in connection with his guilty plea in the McFarland Criminal Action and has been sentenced to and is serving a 6-year term in federal prison as a result of his wrongful conduct.

79.     A judgment of restitution in favor of the United States has been entered against McFarland in the amount of $26,191,306.28 on account of the funds raised by McFarland through his fraudulent conduct.

80.      The Transfers were made in continuation of McFarland's scheme to defraud investors, lenders, and ticket purchasers of the Fyre Festival.

81.    The Transfers were made with actual intent by Fyre Festival to hinder, delay, and/or defraud Fyre Festival's existing creditors, ticket holders and investors, and individuals and entities to which Fyre Festival would become obligated.

82.    All of the Transfers were made within two (2) years of the Petition Date.

83.    There are creditors that hold unsecured claims against Fyre Festival allowable under Section 502 of the Bankruptcy Code that were creditors at the time each of the Transfers was made.

84.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Defendant avoiding the Transfers (the "Actual Fraudulent Transfers") in the amount of $331,709.83 and directing the Defendant to return the Actual Fraudulent Transfers to the Trustee together with prejudgment interest and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Fraudulent Transfers – Constructive Fraud – 11 U.S.C. §§ 544(b), 548(a)(1)(B) and 550; And N.Y. Debtor and Creditor Law §§ 273, 274 and 275)**

85.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 84 of this Complaint as if fully set forth at length herein.

86.    Each of the Transfers was made from Festival Funds.

87.    Each of the Transfers constituted a transfer of an interest of Fyre Festival within the meaning of section 101(54) of the Bankruptcy Code.

88.    Each of the Transfers was to or for the benefit of the Defendant as set forth above.

89.    All of the Transfers were made within two (2) years of the Petition Date.

90.    There are creditors that hold unsecured claims against Fyre Festival allowable under Section 502 of the Bankruptcy Code that were creditors at the time each of the Transfers was made.

91.     Fyre Festival received less than fair consideration or reasonably equivalent value in exchange for making each of the Transfers.

92.     At the time that each of the Transfers was made, Fyre Festival was (i) insolvent or became insolvent as a result of the Transfers; (ii) engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Transfers constituted unreasonably small capital; and/or (iii) intended to or believed that it would incur debts beyond its ability to pay as they matured.

93.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Defendant avoiding the Transfers (the "Constructive Fraudulent Transfers") in the amount of $331,709.83 and directing the Defendant to return the Constructive Fraudulent Transfers to the Trustee together with prejudgment interest and attorneys' fees.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Preferential Transfers – 11 U.S.C. §§ 547(b) and 550)**

94.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 93 of the Complaint as if fully set forth at length herein.

95.     Each of the Transfers was made from Festival Funds.

96.     Each of the Transfers constituted a transfer of interest of Fyre Festival within the meaning of section 101(54) of the Bankruptcy Code.

97.     Each of the Transfers was to or for the benefit of the Defendant as set forth above.

98.     The following Transfers were made within ninety (90) days of the Petition Date:

| Date | Transferor | Amount | Transferee |
|------|-----------|--------|-----------|
| 04/12/2017 | McFarland | $81,709.83 | Lavi |
| 04/12/2017 | McFarland | $20,000.00 | Lavi |

(the "Preferential Transfers").

21

99.     Defendant was a creditor of Fyre Festival at the time the Preferential Transfers were made.

100.     The Preferential Transfers were made for or on account of an antecedent debt owed by Fyre Festival before such transfer was made.

101.     The Preferential Transfers were made while Fyre Festival was insolvent. In accordance with Section 547(f) of the Bankruptcy Code, Fyre Festival is presumed to have been insolvent during the ninety (90) days preceding the Petition Date.

102.     The Preferential Transfers enabled Defendant to receive more than it would receive if (A) the case were commenced as a case under chapter 7 of the Bankruptcy Code; (B) the Preferential Transfers had not been made; and (C) the recipient received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

103.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Defendants avoiding the Preferential Transfers in the amount of $101,709.83 and directing the Defendant to return the Preferential Transfers to the Trustee together with prejudgment interest and attorneys' fees.

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

a)  On the First Cause of Action for the avoidance of Actual Fraudulent Transfers judgment against Defendant avoiding the Actual Fraudulent Transfers in the amount of $331,709.83 and directing the Defendant to return the Actual Fraudulent Transfers to the Trustee together with prejudgment interest and attorneys' fees;

b)  On the Second Cause of Action for the avoidance of Constructive Fraudulent Transfers judgment against Defendant avoiding the Transfers in the amount of $331,709.83 and

directing the Defendant to return the Constructive Fraudulent Transfers to the Trustee together with prejudgment interest and attorneys' fees;

c) On the Third Cause of Action for the avoidance of the Preferential Transfer judgment against Defendant avoiding the Preferential Transfers in the amount of $101,709.83 and directing the Defendant to return the Preferential Transfers to the Trustee together with prejudgment interest and attorneys' fees; and

d) Granting such other and further relief as this Court deems just.

Dated:    New York, New York
          August 28, 2019

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**

By:    _/s/ Fred Stevens_
       Fred Stevens
       Stephanie R. Sweeney
       Christopher J. Reilly
       200 West 41st Street, 17th Floor
       New York, New York 10036
       Tel: (212) 972-3000
       Fax: (212) 972-2245
       Email: fstevens@klestadt.com
              ssweeney@klestadt.com
              creilly@klestadt.com

       _Special Litigation Counsel to Plaintiff_
       _Gregory M. Messer, as Chapter 7_
       _Trustee of Fyre Festival LLC_